## Case No. 3,445.

### CROWELL et al. v. KNIGHT.

[2 Lowell, 307.][1]

District Court, D. Massachusetts. Jan. Term, 1874.

VOYAGE ON LAYS—RIGHTS OF CREW—PAYMENT TO ASSIGNEE OF SHARE.

1. The sharesmen in a cod-fishing voyage are not to suffer loss by the bad debts contracted by the owner in the sale of the fish. The account is to be made up as cash.

2. Where the sharesmen gave an order upon the owners to pay their shares to A., and A. ordered payment to be made to B., which was done, and B. afterwards failed, *held*, the payment discharged the owners, though the order was not negotiable.

Libel for wages on a cod-fishing voyage from Marblehead to the Grand Banks, and elsewhere, during the season of 1872. The libellants [Coleman Crowell and others] were two of the four "sharesmen," the defendant [George Knight] was the owner of the vessel. The contract was that the sharesmen were to have five-eighths of the fish which should be caught, after deducting the general supplies and other supplies according to the custom and usage of the port of Marblehead; and the owner to have the right to sell all the fish and oil whenever he should think proper. Seven of the seamen shipped for specific wages in money. The

[1] [Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

usage was admitted to be, to deduct from the gross proceeds of the voyage the great general charges; then from the balance to take the three-eighths belonging to the vessel; and from that balance the small general charges, including the wages of such seamen as were shipped for wages; and to divide the remainder among the sharesmen. The account rendered by the defendant, and not disputed, made the gross sum originally due each of the sharesmen $380.77, from which deductions were claimed for advances, which were admitted. A further sum of $105.93 was claimed for losses by the failure of a merchant who had bought part of the fish on thirty days' credit, he being then in good standing in the trade. The other question was whether the balance admitted by the defendant to be due had been duly paid. The plaintiffs, having gone on another voyage, sent orders in writing to the defendant to pay their shares to Captain David Morrissey, who was then on his way to Marblehead. The accounts not being ready, Morrissey gave a written order to pay the money to L. A. Surette, which was done, excepting the amount claimed to be deducted for the bad debt. Surette afterwards failed, and was in bankruptcy.

C. G. Thomas, for libellants.
H. W. Paine, for respondents.

LOWELL, District Judge. It has been repeatedly decided in the whaling business that the owners are to pay the lays or shares of the seamen according to the cash value of the oil and bone at the time of its arrival, and that the seamen have no concern with sales for credit, and are not chargeable with any losses that may be sustained by such sales. Some of these decisions have been reported. See Hazard v. Howland [Case No. 6,280]; Bourne v. Smith [Id. 1,701]. The reasons are, that the shares are wages; that the seamen have no ownership in the oil or other catchings, and no right to interfere in its sales; and that they ought not to be expected to assume, and have not assumed by their contract, the delays or risks of the mercantile part of the adventure.

The sharesmen in a fishing voyage do in some respects make a contract more resembling a joint mercantile adventure than those which are usual in whaling voyages; but in the essential matters which govern this case the difference does not seem to be material. They are seamen whose shares are substantially wages, and they are seamen who are to be cured of illness contracted in the course of their duty at the ship's expense. Knight v. Parsons [Id. 7,886]. They have a lien on the vessel, and in some circumstances on the fish; but it is not the lien of partners. They have no voice in the disposal of the catch in any respect; but are creditors of the owners, not bound to go into a court of equity for an adjustment of accounts.

A custom or usage of the port of Marblehead is pleaded, that sharesmen are to receive only their proportion of what may be realized from the sales of the fish and oil. The evidence to support the usage cannot be said to reach the precise point of this case, because the only losses by bad debts that any witness can recall occurred in this very year, 1872, and arose out of the failure of the same house to whom these fish were sold. Indeed, the impression left on my mind by the whole evidence was that the sales of fish had almost always been for cash, or else that there had been no failures in the business, so that no usage could have arisen on the subject. No one could recollect that any seamen had lost any thing by bad debts for a very great number of years; and if the course of business would have suggested any thing in particular to the mind of a person shipping on such voyage, it would be that the pay, at all events, was sure.

The other point is whether the payment to Surette discharges the defendant. There was nothing in the circumstances of the transaction, or in the usual course of business in such cases, that tended to prove either an express or an implied license by the plaintiffs to Morrissey to employ a sub-agent or substitute. It is therefore probable that Morrissey himself is bound to make good the loss by Surette's failure. But this consideration does not seem to me to be decisive of the question as between the parties here. An order to pay the money to Morrissey appears to import that the defendants may pay it to him in any way he may direct. For instance, if he wrote to them to deposit the money in a certain bank, or to send it to him by mail, it does not seem to me that they would be justified in inquiring whether Morrissey had a right, as between himself and his principals, to use those methods of collecting the money. If Morrissey had forwarded his receipt for the money, and ordered the defendants to make payment to Surette, it would be in accordance with the usual mode of doing business, that they should pay upon his order. And this is substantially what occurred. Any other rule would make the propriety of the payment depend on the form of the receipt, which is hardly in accordance with good sense. Indeed, by ordering them to pay Surette, Morrissey undertook to give the defendants a proper receipt whenever they should demand it. I cannot think that in such a matter as this any rule about the due execution of powers ought to govern the decision, but that I must hold the payment to be a good discharge pro tanto. The facts stated in the answer were admitted to be true, but there is a clerical mistake apparent in dividing the shares; one quarter of $1,547.08 is $386.77, and not $380.77.

From the figures given in the answer, I find myself unable to state the account to my own satisfaction. It should be made up

without charging to the libellants their share ($105.93 each) of the bad debts, but charging them with the actual payments to Surette. And they should have interest on the amounts due them for twenty months, i. e., from date of libel, say 10 per cent in all. I thought I had worked this out to give each about $100; but I cannot be sure that I understand the figures of the answer.

Interlocutory decree for libellants.